# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# MIDDLE DIVISION

**PHOEBE CHADWICK *et al.***
    Plaintiffs,

v.

**TNAL MOTORS LLC d/b/a
TWIN CITY USED CARS *et al.*,**
    Defendants.

Case No. 4:23-cv-1491-CLM

## MEMORANDUM OPINION

Phoebe and Gwen Chadwick bought a car from Twin City Used Cars ("Twin City"), who later sent the car to Alexander Ford, Inc. for service repairs. The Chadwicks ask this court to compel arbitration for a dispute arising out of the sale and repair of the car. Twin City and Alexander Ford ("Respondents") move to dismiss for lack of subject matter jurisdiction. (Docs. 6, 12). For the reasons stated within, the court **GRANTS IN PART AND DENIES IN PART** Respondents' motions. (Docs. 6, 12).

## BACKGROUND[1]

### A. The Vehicle

Phoebe Chadwick and her mom, Gwen, visited Twin City's car lot in search of a new car for Phoebe. After Phoebe showed interest in an Acura SUV, a sales agent encouraged her to buy a 2017 Ford Edge. The agent said the car had just come in from an auction and was not yet detailed, but Phoebe agreed to go for a test drive. During the test drive, a check engine light came on. The agent ensured the Chadwicks that there was a simple fix, and that the car was safe and dependable. So the Chadwicks entered a retail installment sales contract ("RISC") with Twin City to buy and finance the car.[2] (Doc. 1-1). While the Chadwicks were

---

[1] These facts are taken from Petitioners' arbitration claim before the American Arbitration Association. (Doc. 1-1).

[2] Phoebe bought the car for herself but financed it in Gwen's name.

signing the final paperwork, the Twin City agent said they were getting a great deal of $19,895 because Twin City bought the car from an auction for $19,300. The Chadwicks and the agent agreed that Twin City would deliver the car to Phoebe's home within three to four days after detailing the car, changing the oil, and resolving the check engine light issue. The agent also ensured the Chadwicks that if anything was ever wrong with the car, Twin City would provide Phoebe with a loaner vehicle.

A week later, Twin City delivered the car to Phoebe's home. But the car had not been detailed and the first time Phoebe cranked the car, the engine light still came on. When she took the car to an auto parts shop to check the light, she was told that an engine cylinder was misfiring. So Phoebe called Twin City, who told her not to have the engine replaced at a different Ford dealership. Instead, it would take the car to the dealership with which Twin City works for repair business—Alexander Ford.

Alexander Ford replaced the engine, but the car broke down less than three months later while Phoebe was out of town. So Phoebe had the car towed to a different Ford dealership. There, service technicians told Phoebe they could not find the previous engine replacement listed under the car's VIN number, but they found new issues caused by the engine replacement. Phoebe paid to have the issues repaired. A month later, the car broke down again and Phoebe had the car towed to a different dealership. Service technicians there told her the engine needed to be replaced again, and that they also could not find the previous engine replacement under the car's VIN number. When the technicians removed the engine from the car, it looked to be old and used. Phoebe paid for a new engine to be installed and for other repairs. A month later, the car was back at another dealership for issues related to the new engine. Phoebe also contacted a previous owner of the car who said he bought it from Twin City for about $3,000 less than Phoebe, and that the car only ran for three weeks in the year that he owned it.

Over 11 months, Phoebe had to pay for towing, repairs, rental cars, and related travel expenses while her car was in the shop each time. She says that her monetary damages totaled $42,439,31:

a. $26,018.57 for the total cost of the Vehicle[1] (¶¶ 15, 46);

b. $1,857.80 for out-of-pocket expenses while the vehicle was out of service and being repaired between January 2022 and March 2022 (¶¶ 20-22);

c. $5,459.74 out of pocket expenses incurred between late May and mid-June 2022 (¶¶ 24-26)

d. $417.15 towing costs in late June 2022 (¶ 27);

e. $621.07 out of pocket expenses for towing and car rental costs in July 2022 (¶ 32); and

f. $8,064.98 for renting another vehicle between August 9, 2022 and November 3, 2022 (¶ 33).

(Doc. 10, p. 4).

### B. The Arbitration

The RISC contained an arbitration provision that says: "Any claim or dispute, whether in contract, tort, statute or otherwise … , between you and us or our employees, agents, successors or assigns, which arises out of or relates to your credit application, purchase or condition of this vehicle, this contract or any resulting transaction or relationship (including any such relationship with third parties who do not sign this contract) shall … be resolved by neutral, binding arbitration … ."

The arbitration provision also provides that "[Twin City] will pay your filing, administration, service or case management fee and your arbitrator or hearing fee all up to a maximum of $5000, unless the law or the rules of the chosen arbitration organization require us to pay more." (Doc. 1-1, p. 5).

So The Chadwicks filed a claim with the American Arbitration Association ("AAA"), alleging violations of the Alabama Deceptive Trade Practices Act ("ADTPA"); fraud; recklessness, wantonness and negligence; negligent supervision; and revocation of acceptance under the Alabama Uniform Commercial Code ("Alabama UCC"). (Doc. 1-1). But Twin City failed to pay the required arbitration fees, so the AAA declined to administer the case. (Doc. 1-1, pp. 25-30).

The Chadwicks now ask this court to compel arbitration under the Federal Arbitration Act and to order Twin City to pay arbitration costs consistent with the RISC agreement's arbitration provision.

Alexander Ford first moved to dismiss for lack of subject matter jurisdiction. (Doc. 6). Twin City joined in that motion and adopted each of Alexander Ford's arguments. (Doc. 12). The court addresses both motions at once.

## STANDARD OF REVIEW

When a claim is challenged for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), the party bringing the claim bears the burden of establishing proper subject matter jurisdiction. *Sweet Pea Marine Ltd. v. APJ Marine, Inc.*, 411 F.3d 1242, 1247 (11th Cir. 2005). And "[i]f the plaintiff fails to shoulder that burden, the case must be dismissed." *Williams v. Poarch Band of Creek Indians*, 839 F.3d 1312, 1314 (11th Cir. 2016) (citing *In re Trusted Net Media Holdings, LLC*, 550 F.3d 1035, 1042 (11th Cir. 2008)).

## DISCUSSION

Respondents contend that this federal court lacks jurisdiction to compel arbitration. Under the Federal Arbitration Act ("FAA"), parties can petition a United States court for an order to compel arbitration, but only if that court would have jurisdiction over the dispute. 9 U.S.C. § 4 ("A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration *may petition any United States district court which, save for such agreement, would have*

*jurisdiction under title 28 …* for an order directing that such arbitration proceed in the manner provided for in such agreement.") (emphasis added). The FAA "bestow[s] no federal jurisdiction but rather requir[es] [for access to a federal forum] an independent jurisdictional basis" over the parties' dispute. *Vaden v. Discover Bank*, 556 U.S. 49, 59 (2009) (quoting *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 582 (2008)).

So the court must determine whether it would have jurisdiction to hear the contractual dispute between the Chadwicks and Respondents if the RISC agreement did not have an arbitration clause.

### A. Federal Question Jurisdiction (28 U.S.C. § 1331)

In their complaint, the Chadwicks cite the federal question statute, 28 U.S.C. § 1331, as giving this court jurisdiction because their case "arises under the Federal Arbitration Act, 9 U.S.C. § 4." (Doc. 1, ¶ 6). But as explained, the FAA *alone* does not create a federal question; it says that the Chadwicks can petition a federal district court if the court would have jurisdiction "save for such [arbitration] agreement. 9 U.S.C. § 4. So the court must determine whether the Chadwicks have established that this court has federal question jurisdiction apart from the FAA. To do this, "[a] federal court may 'look through' a § 4 petition to determine whether it is predicated on an action that 'arises under' federal law." *Vaden*, 556 U.S. at 62. According to the Eleventh Circuit, this means that the court must look to the underlying dispute—not the argument over its arbitrability—and, regardless of whether the controversy between the parties is embodied in preexisting litigation, ask: "Would a federal court have jurisdiction over an action arising out of that full-bodied controversy?" *Cmty. State Bank v. Strong*, 651 F.3d 1241, 1255 (11th Cir. 2011) (citing *Vaden*, 556 U.S. at 68 n.16). "In other words, the proper jurisdictional inquiry is whether either party to the § 4 petition '*could* file a federal-question suit' based on the parties' underlying dispute." *Id.*

The Chadwicks attach their FAA Claim to their petition. (Doc. 1-1). In it, they allege seven counts—all violations of *Alabama* statutory and

common law. (Doc. 1-1, pp. 17-24). None of the seven counts allege a violation of *federal* law.

As a result, the court would not have federal question jurisdiction absent the arbitration clause. So the FAA, 9 U.S.C. § 4, does not create a federal question that vests jurisdiction under 28 U.S.C. § 1331. In fact, when Respondents challenged the Chadwicks' reliance on 28 U.S.C. § 1331 (doc. 6), the Chadwicks pivoted to 28 U.S.C. § 1332, arguing that the court instead has diversity jurisdiction. (Doc. 10, p. 2). So the court moves there next. *See Moses H. Cone Mem'l Hosp.*, 460 U.S. at 25 n.32.

### B. Diversity Jurisdiction

1. *The law*: To invoke the court's diversity jurisdiction, the Chadwicks must show that the parties are completely diverse and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332. Complete diversity means that "every plaintiff must be diverse from every defendant." *Travaglio v. Am. Exp. Co.*, 735 F.3d 1266, 1268 (11th Cir. 2013) (citations omitted). "Citizenship, not residence, is the key fact that must be alleged in the complaint to establish diversity for a natural person." *Id.* at 1269 (quoting *Taylor v. Appleton*, 30 F.3d 1365, 1367 (11th Cir. 1994)). "Citizenship is equivalent to 'domicile,'" which requires "both residence in a state and 'an intention to remain there indefinitely.'" *Id.* (citations omitted).

A corporation is a citizen of its state of incorporation and the state where it has its principal place of business. 28 U.S.C. § 1332(c)(1). A principal place of business is "the place where a corporation's officers direct, control, and coordinate the corporation's activities" (i.e., the "nerve center"). *Hertz Corp. v. Friend*, 559 U.S. 77, 92-93 (2010). A limited liability company is a citizen of any state of which a member of the company is a citizen. *Rolling Greens MHP, L.P. v. Comcast SCH Holdings LLC*, 374 F.3d 1020, 1022 (11th Cir. 2004); *Flintlock Const. Servs., LLC v. Well-Come Holdings, LLC*, 710 F.3d 1221, 1224 (11th Cir. 2013). To sufficiently allege the citizenship of a limited liability company, a party must identify the citizenships of all its members. *Rolling Greens*, 374 F.3d

at 1022; *Underwriters at Lloyd's, London v. Osting-Schwinn*, 613 F.3d 1079, 1091 (11th Cir. 2010) (quotation omitted). This means alleging (1) who the members of the LLC are and (2) the citizenship (not mere residency) of those members.

2. *Amount in Controversy*: Respondents say that the Chadwicks have failed to prove the amount in controversy exceeds $75,000. (Docs. 11, 12). Alexander Ford says it only replaced the engine which, including parts and labor, was only $6,033.06. (Doc. 11, pp. 3-4). Twin City adopted Alexander Ford's argument but did not respond separately.

The court disagrees. The Chadwicks seek $42,439.31 in monetary damages arising from the total cost of the vehicle, out-of-pocket expenses from having the car towed and repaired, rental car expenses, and related travel expenses. They seek damages for time off work, loss of personal time, mental and emotional anguish, and financial distress. They also seek treble damages for their ADTPA claim and punitive damages for their fraud claims. (Doc. 10, p. 5; Doc. 1-1, pp. 18-20). And the Chadwicks have pled facts to support that Alexander Ford's engine replacement *could have* caused nearly all of Phoebe's monetary damages after buying the car. Considering these facts and the damages sought, the Chadwicks have met their burden of showing the amount in controversy exceeds $75,000. *See Blackwell*, 620 F. Supp. 2d at 1291 ("[A] punitive award of slightly more than double the compensatory damages claim would occasion an amount in controversy that exceeds the jurisdictional minimum.").

3. *Complete Diversity*: That said, the court finds that the Chadwicks have not established complete diversity among the parties. The Chadwicks allege that complete diversity exists because (a) Phoebe and Gwen are both *residents* of Georgia and (b) Respondents are "business entities in Alabama and Tennessee each with a business location in Alabama." (Doc 10, p. 3). While the Chadwicks might ultimately be correct, these allegations are not enough to establish diversity under Eleventh Circuit precedent.

The Chadwicks must correct these deficiencies:

1. The Chadwicks must plead that they are citizens of Georgia, not merely residents. The Chadwicks should indicate whether they are domiciled in Georgia (*i.e.*, whether they reside there and intend to remain there indefinitely). *Travaglio*, 735 F.3d at 1269.
2. Twin City is an LLC. So the Chadwicks must identify each of Twin City's members and allege the citizenship of each of those members. *Rolling Greens*, 374 F.3d at 1022.
3. Alexander Ford is a corporation. The Chadwicks must establish Alexander Ford's (1) state of incorporation and (2) principal place of business—meaning the place where its officers "direct, control, and coordinate the corporation's activities." *Hertz Corp.*, 559 U.S. at 92-93.

The court cannot proceed until the Chadwicks sufficiently address these issues because, until the court is satisfied that it has subject matter jurisdiction, it is "powerless to continue." *Bochese*, 405 F.3d at 974-75. For this reason, the court will not address Respondents' arguments on the merits of Petitioner's petition.

—

"Defective allegations of jurisdiction may be amended." 28 U.S.C. § 1653. So the court will allow the Chadwicks an opportunity to replead facts to establish that diversity jurisdiction exists. The Chadwicks have until on or before **September 20, 2024**, to replead their petition. Once the Chadwicks file their amended petition, Respondents will have the opportunity to again file responsive pleadings, and the court will consider whether the deficiencies have been resolved.

## CONCLUSION

For the reasons stated within, the court **GRANTS IN PART AND DENIES IN PART** Respondents' motions. (Docs. 6, 12). The Chadwicks must replead their petition by **September 20, 2024**, in a manner that establishes that this court has jurisdiction. Failure to do so will result in dismissal of this case.

**DONE** and **ORDERED** on September 3, 2024.

_____
**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE